JAMES ESPY *vs.* AGNES N. EELLS & another.

Dukes County.   May 5, 1965. — June 8, 1965.

Present: WILKINS, C.J., WHITTEMORE, CUTTER, KIRK, & REARDON, JJ.

*Broker,* Scope of authority. *Agency,* Scope of authority, Broker.
   *Frauds, Statute of. Contract,* For sale of real estate.

In a suit in equity for specific performance of an oral contract for sale
   of land to the plaintiff arranged through the seller's broker but repudi-
   ated by the seller on the same day she made it when she signed a written
   contract to sell the land to another, the trial judge was justified in con-
   cluding that the broker, shown only to have been given the usual listing
   to produce a purchaser willing and able to buy on the seller's terms,
   had no authority from the seller to sign for her any memorandum of
   the oral contract, and that any authority which the broker had to act
   for the seller terminated when she signed the written contract; and,
   where the statute of frauds was pleaded, a decree dismissing the bill
   was proper irrespective of the sufficiency as a memorandum of letters
   written by the broker to the plaintiff after the day in question.

BILL IN EQUITY filed in the Superior Court on October 24,
1963.

The suit was heard by *Macaulay, J.*

*Richard Wait* for the plaintiff.

*John L. Saltonstall, Jr.,* for the defendant.

CUTTER, J.   This is a bill in equity to obtain specific per-
formance of an alleged contract to sell real estate on
Martha's Vineyard, or in the alternative to obtain dam-
ages.   One Styron and his wife were permitted to inter-
vene.   The plaintiff appealed from a final decree dismissing
the bill.   The evidence is reported.   The facts are stated,
except as otherwise indicated, on the basis of a very com-
plete report of material facts.

Mrs. Eells listed her residential shore front property on
Vineyard Harbor with a broker named Cronig and "with
at least one other broker . . . .   No special authority was
given . . . [to] Cronig other than the usual listing contract
to produce a purchaser, willing and able to buy . . . on the
seller's terms.   No written authorization was given."

After preliminary negotiations with Cronig, Espy, from Washington, told Cronig's associate and secretary in Vineyard Haven by telephone on Friday, September 13, 1963, "that . . . [Espy] and his wife . . . would pay Mrs. Eells' price of" $75,000. Espy emphasized that he wanted the property and said, "[P]lease latch it down for me." Espy then "did not know 'what the financial details would be.'" At noon that day, Cronig called Espy, then still in Washington, and reported that he had seen Mrs. Eells who had said that Espy's "acceptance of her offer was agreeable to her." She also was reported as saying, "I feel sorry for the Styrons [other people who had been bidding for the property] — but this is a business matter and . . . Espy has met my price."

Cronig then told Espy he must put down a deposit of ten per cent and that "[s]ettlement . . . will be within sixty days." Espy promised that he would "come up just as soon as possible to settle the matter," that he "would sign whatever documents, whatever had to be done," and that he would send a check. Espy testified that he understood that then "the contract was completed" and that only "formalities" remained.

Later that afternoon, apparently before 2:15 p.m., Cronig called Mrs. Espy and said, "[E]verything was a mess . . . . Mrs. Styron had come . . . [to Mrs. Eells] and said that she would pay $75,000 . . . or meet any bid that . . . [Espy] might make." Espy, then away from the house, upon his return failed to reach Cronig by telephone. Thereupon he sent Cronig a telegram insisting "on fulfillment of contract I made today through you with Mrs. Eells" and stating that he would "bring legal action." He transmitted to Cronig by air mail a letter, mailed at 2:25 p.m. or 2:30 p.m. that day, which said, "In conformity with our telephone call, my contract with Mrs. Eells, I am enclosing a deposit of $7,500." The evidence shows that the deposit check bore the notation, "For ten per cent deposit on purchase of Eells' property off Main Street, Vineyard Haven."

That evening, after a further telephone conference with Cronig, Espy arrived by airplane at Vineyard Haven. There he learned from Cronig that Mrs. Eells in the afternoon had signed a written contract for the sale of the property to the Styrons at some time between 2:15 P.M. and 3:30 P.M. despite her earlier acceptance of Espy's offer.

On September 19, 1963, Cronig returned Espy's check with a letter, "It is with regret that I return the enclosed check in the amount of $7500.00 to you. Under the circumstances, I have no alternative."[1]

The trial judge in effect ruled (1) that, despite the telephone talk between Cronig and Espy accepting the latter's offer, the parties had intended to enter into a later formal written contract of purchase and sale; and (2) that neither Cronig's letter of September 19 nor the exchange of correspondence marked for identification constituted an adequate memorandum to satisfy the statute of frauds (G. L. c. 259, § 1, Fourth[2]), which was pleaded. The judge concluded that "Mrs. Eells gave no authorization, written or oral, to . . . Cronig, to execute in her behalf any written promise, contract or agreement — and he did not do so."

Even if it be assumed (1) that the parties intended to make an immediate oral contract when Cronig communicated to Espy Mrs. Eells' acceptance of Espy's $75,000 offer, and (2) that Mrs. Eells shortly thereafter was induced by the Styrons to repudiate a firm oral commitment to Espy, the statute of frauds was pleaded. This made it necessary for Espy to prove (see *Weiner* v. *Slovin*, 270

---

[1] In another letter (dated October 1, 1963), marked only for identification, Cronig wrote to Espy, "You have no idea how badly I feel over the unfortunate ending of this sale of real estate." This was in reply to a letter (dated September 23, 1963) from Espy (also marked only for identification) acknowledging the return of his deposit check, stating that "it is perfectly clear that I had made a contract of purchase [of the property] through you with Mrs. Eells," and inquiring "whether there is any chance of Mrs. Eells' going through now voluntarily with her agreement with me."

[2] The pertinent language of § 1 reads, "No action shall be brought . . . Fourth, Upon a contract for the sale of lands . . . or of any interest in . . . them . . . [u]nless the promise, contract or agreement upon which such action is brought, or some memorandum or note thereof, is in writing and signed by the party to be charged therewith *or by some person thereunto by him lawfully authorized*" (emphasis supplied).

Mass. 392, 394; *Beaver* v. *Raytheon Mfg. Co.* 299 Mass. 218, 219; *Gordon* v. *O'Brien,* 320 Mass. 739, 741) the existence of an adequate memorandum of the commitment, signed by Mrs. Eells or by some person "lawfully authorized" (fn. 2) by her. No memorandum was signed by Mrs. Eells. Any satisfaction of the requirements of the statute of frauds must rest on Cronig's letters.

We need not consider whether the correspondence between Cronig and Espy would have constituted an adequate memorandum,[3] if Mrs. Eells had in fact authorized Cronig to sign a memorandum for her. The trial judge was justified in concluding that Cronig had no authority from Mrs. Eells to sign for her any memorandum. See *Harrigan* v. *Dodge,* 216 Mass. 461, 463–464; *Record* v. *Littlefield,* 218 Mass. 483, 485–486. See also *Vallis* v. *Rimer,* 335 Mass. 528, 532. The evidence, almost entirely oral, did not require (if, indeed, it permitted) the judge to find that Cronig had more authority from Mrs. Eells than to produce a customer. See Restatement 2d: Agency, § 53, comment b. The judge could reasonably have concluded, also, that any authority which Cronig may have had to act for Mrs. Eells terminated when (because of the contract with the Styrons) her land ceased to be available for sale, several days before Cronig's first letter, that of September 19, 1963. See *Elliot* v. *Barrett,* 144 Mass. 256, 257; *Giolitto* v. *Dingolo,* 251 Mass. 38, 40; Corbin, Contracts, § 525, esp. at p. 780. See also Williston, Contracts (3d ed.) § 588. Cf. *Forman* v. *Gadouas,* 247 Mass. 207, 209–210, 214.

*Decree affirmed.*

---

[3] See *George Lawley & Son Corp.* v. *Buff,* 230 Mass. 21, 23 (repudiation as an adequate memorandum); *Cousbelis* v. *Alexander,* 315 Mass. 729, 730–731 (consideration of adequacy of statement of terms); *Sennott* v. *Cobb's Pedigreed Chicks, Inc.* 324 Mass. 9, 11 (refusal to perform as a memorandum); Restatement, Contracts, §§ 207–209.